NOT FOR PUBLICATION

```
                   UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>JEAN PIERRE COLLARDEAU,<br><br>      Defendant. | Crim. No. 03-800 (WGB)<br><br>O P I N I O N |

**APPEARANCES:**

CHRISTOPHER J. CHRISTIE
United States Attorney
By:  Mauro M. Wolfe, AUSA
970 Broad Street
Newark, New Jersey  07102

    Attorney for United States

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
By:  Paul J. Fishman, Esq.
     Anne E. Beaumont, Esq.
One Gateway Center
Newark, New Jersey 07102

    Attorneys for Defendant Jean Pierre Collardeau

**BASSLER, SENIOR DISTRICT JUDGE:**

    On August 16, 2004, Defendant Jean Pierre Collardeau ("Collardeau") pleaded guilty to the first count of an indictment charging him with conspiracy to commit securities fraud, mail fraud, and wire fraud, in violation of 15 U.S.C. § 371.

    As part of Collardeau's sentence, the Government seeks a restitution order against Collardeau in the amount of at least

$36 million.  Collardeau opposes such an order.

For the reasons set forth below, the Court **denies** the Government's motion seeking restitution.

## BACKGROUND

Defendant Collardeau founded Pro Net Link Corp. ("PNLK") as a privately held company in July 1997.  (Rule 11 Tr., Gov't Moving Br., Ex. A, at 24-25.)  Collardeau acted as the President, Chief Executive Officer, and Director of PNLK.  (Id. at 25.)

PNLK became a public company through a reverse merger in September 1997.  (Id.)  PNLK's shares traded on the OTC Bulletin Board.  (Id.)  PNLK launched an internet website in April 1999 to promote and sell its import/export services.  (See SEC Form 10, Gov't Moving Br., Ex. E, at 3-6.)  On July 2, 2001, however, PNLK filed for bankruptcy.  (See SEC Form 8-K, Gov't Moving Br., Ex. J., at 1.)

In April 2003, PNLK shareholders filed a securities class action in the Southern District of New York alleging they had lost money on their investments in PNLK stock over a three-year period from 1998 to 2001.  The plaintiffs alleged that Collardeau and others misled investors during this time by misrepresenting various aspects of the company's financial condition.

On November 6, 2003, the Government filed a three-count indictment (the "Indictment") against Collardeau, nine co-defendants, and four unindicted co-conspirators.  Count 1 of the

Indictment charged Collardeau with conspiracy to commit securities fraud, mail fraud, and wire fraud, in violation of 18 U.S.C. § 371.  Counts 2 and 3 of the Indictment charged Collardeau with securities fraud and conspiracy to commit money laundering.  The Indictment covered a period from in or about July 1997 to in or about May 2001.  (Indictment at 6.)

On August 16, 2004, Collardeau and the Government entered into a plea agreement (the "Plea Agreement").  Collardeau pleaded guilty to Count 1 of the Indictment.  (Plea Agreement at 1.)  The Plea Agreement contained a provision that stated, "in addition to imposing any other penalty on Jean Pierre Collardeau, the sentencing Judge . . . (2) must order Jean Pierre Collardeau to pay restitution pursuant to 18 U.S.C. §§ 3663 et seq."  (Id. at 2.)

In the Plea Agreement, Collardeau stipulated and agreed that the period of his fraudulent conduct occurred from "in or about July 1997 to in or about May 2001."  (Id. at 9, ¶ 2.)  He also stipulated and agreed that the conspiracy gained in excess of $20 million, but less than $40 million.  (Id. at 9, ¶ 3.)  He further stipulated and agreed that his offense involved "more than minimal planning and a scheme to defraud more than one victim."  (Id. at 9, ¶ 4.)

The Court took the plea colloquy during a Rule 11 hearing on August 16, 2004.  During the hearing, Collardeau admitted that he

caused PNLK to issue millions of shares of stock in the names of co-conspirators and nominees. (Rule 11 Tr. at 25.) Collardeau also admitted that in or about March 1998 he entered into an agreement with Irving Freiberg and Irving Stitsky to "tout ProNetLink to the investing public on the Stockgenie.com website . . . in order to spark interest and greater demand for PNLK stock." (Id. at 28.) Collardeau admitted to concealing the true nature of the arrangement with Freiberg and Stitsky from the public. (See id. at 30-31.) Finally, Collardeau admitted that some of the million-dollar profits from the sale of PNLK stock from nominee accounts were used to finance operations of the company, pay co-conspirators to ensure their continued participation in the scheme, and purchase shares of PNLK stock. (Id. at 31.)

## DISCUSSION

### I. Statutory Framework

Restitution in this case is governed by the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A.[1] The MVRA makes it

---

[1] Congress passed the MVRA in 1996 as a supplement to the Victim and Witness Protection Act of 1982 ("VWPA"), 18 U.S.C. § 3663. Whereas restitution under the VWPA is discretionary and the district court must consider the defendant's resources in imposing restitution, 18 U.S.C. § 3663(a)(1)(A),(B), the MVRA eliminates this discretion with respect to restitution for certain classes of crimes and mandates restitution regardless of the defendant's ability to pay, 18 U.S.C. § 3663A(a)(1). See United States v. De La Fuente, 353 F.3d 766, 769 (9th Cir. 2003). Because the language of the MVRA and the VWPA is identical in all other respects, Third Circuit cases interpreting the VWPA are also binding here. See United States v. Simmonds, 235 F.3d 826, 831 n.2 (3d Cir. 2000).

The Supreme Court's recent decision in United States v. Booker, 2005 WL 50108 (Jan. 12, 2005), does not affect the application of the MVRA in this case. The Government has concluded that Booker has no effect on this Court's

mandatory for a court to order restitution where a defendant has pleaded guilty to fraud if "an identifiable victim or victims has suffered a physical injury or pecuniary loss."  18 U.S.C. § 3663A(c)(1)(A)(ii),(B).  However, the MVRA does not apply where the number of identifiable victims makes restitution impracticable or where determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong sentencing to an intolerable degree.  18 U.S.C. § 3663A(c)(3).

>The MVRA defines "victim" as a
>
>person **directly and proximately harmed** as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person **directly harmed** by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2) (emphasis added).  Therefore, restitution must be ordered only if the victims were "directly harmed" by the conspiracy to which Collardeau pleaded guilty.  The Third Circuit Court of Appeals interprets "direct" to "require that the harm to the victim be closely related to the scheme, rather than tangentially linked."  United States v. Kones, 77 F.3d 66, 71 (3d Cir. 1996).  In addition, the Third Circuit Court of Appeals interprets "defendant's criminal conduct in the course of the

---

determination of restitution, and Defendant Collardeau has not objected to that conclusion.

scheme, conspiracy, or pattern" to mean "conduct that is both engaged in the furtherance of the scheme, conspiracy or pattern, and proscribed by the criminal statute the defendant was convicted of violating." Id.

The Government bears the burden, by a preponderance of the evidence, of demonstrating that these statutory requirements are met. See 18 U.S.C. § 3664(e) ("The burden of demonstrating the amount of loss sustained by a victim as a result of the offense shall be on the attorney for the Government . . . The burden of demonstrating such matters as the court deems appropriate shall be upon the party designated by the Court as justice requires.").

For the following three reasons, the Government has not met its burden.

**II. Whether Restitution Can Be Ordered in this Case**

Under the MVRA, the Government must demonstrate that the victims were directly harmed by the conspiracy of which Collardeau was a part. However, the alleged acts upon which the Government now relies--making false revenue projections and disguising the insolvency of PNLK--were not a part of the conspiracy to which Collardeau pleaded guilty.

Courts must look to the offense of conviction to establish the limits of a restitution order. Hughey v. United States, 495 U.S. 411, 420 (1990). "[A] defendant may not be ordered to pay restitution for losses unrelated to the acts for which he was

-6-

convicted. . . . The conduct underlying the offense of conviction thus stakes out the boundaries of the restitutionary authority." United States v. Akande, 200 F. 3d 136, 141 (3d Cir. 1999).

The Government misreads this case law to infer that the Government can rest upon the allegations contained in the indictment in its motion for restitution:

> The United States did not find any case to support the assertion by the defendant that his colloquy controls the amount of restitution or in any manner limits the restitutionary amount. In the instant case, it is plain that the amount of restitution is controlled by the defendant's scheme and conduct as described in count one of th Collardeau Indictment.

(Gov't Suppl. Br. at 2.)  Therefore, the Government relies solely on the allegations contained in the Indictment in its attempt to prove that Collardeau's conduct directly harmed the shareholders of PNLK.

Hughey and Akande do not stand for the proposition that the Government can rest solely upon the Indictment in its motion for restitution.  Rather, they state that a court cannot base a restitution order on conduct that falls outside of or is unrelated to the offense of conviction.  The Government is still required to adequately prove the conduct alleged in the Indictment.

Where the offense of conviction is a conspiracy, a court may award restitution for acts that are part of the conspiracy, even if the defendant did not allocute to those specific acts.  See

-7-

Akande, 200 F.3d at 139; United States v. Adams, 363 F.3d 363, 366 (5th Cir. 2004).  However, "[w]hen a defendant is convicted of fraud pursuant to a plea agreement, [rather than a jury verdict], this Court looks beyond the charging document, and defines the underlying scheme by referring to the mutual understanding of the parties."  Adams, 363 F.3d at 366.  Thus,

> When a defendant pleads guilty . . . the scope of the underlying scheme is defined by the parties themselves. . . . The mutual understanding reached by parties during plea negotiations is normally not detailed in the original charging document, and is more often gleaned from any superceding indictments, plea agreements, and statements made by the parties during plea and sentencing hearings.

Id. at 367.

The "mutual understanding" reached between the Government and Collardeau is that Collardeau would plead guilty to a conspiracy in which he used nominee accounts to hide the true identities of the owners of most of PNLK's free-trading stock, used the profits from the sale of PNLK stock from the nominee accounts to finance the operation of PNLK, and failed to disclose the true compensation paid to two individuals to tout PNLK on the Stockgenie.com website.  (See Rule 11 Tr., Gov't Moving Br., Ex. A, at 25-34.)

The Government, however, seeks to base restitution on PNLK's allegedly fraudulent revenue projections and PNLK's alleged insolvency.  But false and misleading revenue projections were not a part of the "mutual understanding" between the parties:

-8-

Collardeau did not plead guilty to those projections and he did not allocute to them in his plea colloquy. The final Presentence Report echoed this mutual understanding. (<u>Compare</u> Draft Presentence Report §§ 55, 64, 68, 79 <u>with</u> Final Presentence Report §§ 55, 64, 68, 79 (eliminating any references to a "pump-and-dump" scheme as well as any vague statements that could lead to inference of false and misleading revenue projections).) All of the statements that Collardeau admitted were false related to the ownership of PNLK stock, not to the revenue projections of the company or statements about its financial condition. (<u>See</u> Rule 11 Tr., Gov't Moving Br., Ex. A, at 25-29; Final Presentence Report §§ 55, 64, 79.)

Because the acts upon which the Government relies were not part of the offense of conviction, they cannot form the basis for a restitution order. The allegedly false revenue projections and Collardeau's role in causing PNLK's insolvency are disputed by Collardeau. The Court cannot award restitution on disputed facts. <u>See</u> <u>United States v. Silkowski</u>, 32 F.3d 682, 689 (2d Cir. 1994) (refusing to order restitution where defendant pleaded guilty but repeatedly and vigorously objected to indictment and information set forth in plea colloquy).

**III. Whether Stockholders Were "Directly Harmed"**

Even if the Court were to accept the Government's version of the facts, the Government has not established causation. Proof

of causation in the context of criminal restitution can be likened to that required in the civil context of a securities fraud claim. The rule in this circuit and in others requires plaintiffs alleging securities fraud to prove two types of causation: transaction causation and loss causation. See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 172 (3d Cir. 2001); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005).

Transaction causation "is akin to reliance, and requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" Id. (citation omitted). More than proving just transaction causation, however, a plaintiff must also demonstrate loss causation: "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Id. (citation and internal quotation marks omitted); see also Newton, 259 F.3d 173 ("Loss causation demonstrates that the fraudulent misrepresentation actually caused the loss suffered.").

In the context of criminal restitution, the loss causation analysis applies. See United States v. Cummings, 189 F. Supp. 2d 67, 76-77 (S.D.N.Y. 2002) ("causal nexus . . . between the loss and the conduct, resembles the Second Circuit's definition of loss causation in the context of securities fraud"). Therefore,

-10-

the Government must demonstrate a causal connection between Collardeau's conduct and a victim's loss.  See Kones, 77 F.3d at 71 (statutory definition of "victim" does not "include a person who has experienced no harm arising from the criminal conduct that gives rise to the offense of conviction").

The Courts of Appeals for the First and Ninth Circuits have adopted similar tests of causation.  See United States v. Cutter, 313 F.3d 1, 7 (1st Cir. 2002) ("the government must show not only that a particular loss would have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)") (quoting United States v. Vaknin, 112 F.3d 579, 589-90 (1st Cir. 1997)); United States v. Meksian, 170 F.3d 1260, 1263 (9th Cir. 1999) ("the main inquiry for causation in restitution cases [is] whether there was an intervening cause and, if so, whether this intervening cause was directly related to the offense conduct").

In Meksian, the defendant misstated his income in applying for a loan from the Small Business Administration ("SBA").  170 F.3d at 1361.  The defendant pledged a piece of property as collateral for the loan.  Id.  The defendant defaulted on the loan.  Id. at 1262.  The SBA was unable to recover the full amount of the loan because the collateral was contaminated and was therefore worthless.  Id.

-11-

The defendant pleaded guilty to making false statements to a federally insured financial institution. Id. The district court ordered that the defendant pay restitution to the SBA. Id. The Ninth Circuit Court of Appeals reversed, holding that restitution was not proper because the SBA's loss did not result from the defendant's false statements. Id. at 1263. The SBA lost money because of its intervening reliance on a third party's inaccurate environmental risk report, which misstated the contamination of the collateral. Id.

Transaction causation clearly existed in Meksian: but for the defendant's false statements about his income, the SBA would not have approved his loan. The court of appeals denied restitution, however, because there was no loss causation: the defendant's false statements did not actually cause the SBA's loss.

Just as in Meksian, transaction causation exists here: but for Collardeau's failure to disclose stock ownership, investors would not have bought PNLK stock. Nonetheless, the Government has not shown that Collardeau's conduct directly caused loss to the investors; in other words, the Government has not demonstrated loss causation.

In a civil securities fraud action, plaintiffs must plead loss causation by alleging facts demonstrating that: (1) because of defendant's material omission or misstatement the price of

-12-

defendant's stock was overvalued at the time of plaintiff's purchase; and (2) after a corrective disclosure the price of the stock declined. <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 185-86 (3d Cir. 2000). This analysis is instructive in this case. The Government alleges that PNLK stock was overvalued because of Collardeau's conduct. Even assuming this to be true, the price of the stock declined well before any corrective disclosure was issued. According to the Government, the stock price of PNLK dipped to $.875 on April 16, 1998 but rose to "an all time high on May 13, 1998 of $7.4688." (Gov't Moving Br. at 14, citing Bloomberg ticket, Ex. H.) The stock price subsequently fell back to $3.0313 by May 21, 1998. (Bloomberg ticket, Gov't Moving Br., Ex. H.) Nonetheless, these dramatic price fluctuations occurred well before the public become aware of the conduct underlying the conspiracy on November 6, 2003, the date Collardeau was indicted. In addition, the Indictment was filed more than two years after PNLK filed for bankruptcy in July 2001. Because PNLK ceased trading before the conspiracy was revealed, Collardeau's conduct could not have affected the value of the shares. Therefore, the Government has not proved loss causation.

The Government nonetheless argues that causation can be shown in this case by application of the "fraud on the market" theory. In fraud-on-the-market cases,

> causation is not premised on any specific transaction between plaintiff and defendant . . . Causation lies in

-13-

> the fact that the plaintiff relied on the market price
> of the security as an indicator of the future value of
> the stock.  To the extent that the defendant's
> misrepresentations artificially altered the price of
> the stock and defrauded the market, causation is
> presumed.

Gebhardt v. ConAgra Foods, Inc., 335 F.3d 824, 828 n.2 (8th Cir. 2003) (internal citation and quotation marks omitted).  The fraud-on-the-market theory, however, only satisfies the transactional causation requirement and not that of loss causation.  See id. at 828 (plaintiffs could not show transaction causation without fraud-on-the-market theory); see also Pinker v. Roche Holdings Ltd., 292 F.3d 361, 373 (3d Cir. 2002) ("A plaintiff may prove reasonable reliance under a fraud-on-the-market theory.").  Again, the Government may be able to demonstrate reliance or transaction causation by applying the fraud-on-the-market theory, but the Government has not shown loss causation.

Finally, in its supplemental brief, the Government proposes two new theories of loss causation: "illiquidity" and "insolvency."  Under its theory of illiquidity, the Government argues that no reasonable investor would have purchased PNLK stock if he was aware of Collardeau's conduct.  "Thus, if no reasonable investor would have purchased PNLK stock, this Court can reasonably infer that Collardeau's criminal conduct would have caused PNLK stock to be illiquid, i.e., stop trading, and thus effectively worthless."  (Gov't Suppl. Br. at 6.)  This

theory, however, confuses the standard of transaction causation with that of loss causation.  The Government's theory of illiquidity may prove transaction causation, but it does not prove loss causation.

The Government's second theory, that of insolvency, also fails to prove loss causation.  The Government claims that Collardeau's conduct caused the insolvency and made PNLK virtually worthless.  Because PNLK was "insolvent from inception and that [information was] concealed from the investing public," the Government claims that Collardeau caused shareholders "to be directly harmed by overpaying for a virtually worthless stock." (Id. at 7.)  But the Government argues, and Collardeau concedes, that "all start-up companies are insolvent." (Id.)  If this is true, then Collardeau's conduct could not have caused PNLK's insolvency.

In addition, the Government cites to a report in <u>Business Wire</u> for the proposition that "Pro Net Link is grossly overvalued. . . . [A] company with no revenues, historical losses, no proven market acceptance, little marketing dollars to launch a worldwide marketing campaign for its website, and no proprietary information is barely worth $1 million." (<u>Chatfield Dean & Co. Releases Research Report on Pro Net Link Corp.</u>, Bus. Wire, May 14, 1998, Gov't Moving Br., Ex. I.)  This research report was and is public information, and the author/analyst

apparently drafted her report based upon information that was publicly available. Because the public had available to it information that PNLK was insolvent or at the very least overvalued, investors' losses cannot be attributed solely to Collardeau's concealment of the nominee accounts.

For these reasons, the Government has failed to show that the investors' losses were caused by Collardeau's conduct. As the Government has not demonstrated direct harm to the alleged victims, the Court declines to order restitution.

**IV. Whether Victims Are "Identifiable"**

The final problem with the Government's motion for restitution is the lack of identifiable victims and the difficulty of framing a restitution order. Rather than identify victims by name, the Government proposes that the Court award restitution to three classes of victims: (1) PNLK shareholders that sold the stock for a loss during the relevant period, from in or about July 1997 through in or about May 2001; (2) PNLK shareholders who never sold the stock and lost everything when PNLK went bankrupt in July 2001; and (3) PNLK shareholders who sold the stock for a gain.

The Government proposes an illogical and overly simplistic method to calculate the damages for these classes. The Government proposes that the first class of victims receive restitution in the amount of the difference between the purchase

price and the sale price.  This calculation, however, presumes without any factual support that the entire loss suffered by the shareholders was caused by Collardeau's conduct.  The Government proposes that the second class receive restitution in the amount of the purchase price because those shareholders lost everything.  This calculation suffers from the same problem.  Finally, the Government proposes that the third class be awarded the difference between the gain received and the purchase price.  This calculation makes absolutely no logical sense and is not worth explaining in detail at this point.

    The Government's proposal to award restitution to three separate victim "classes" suffers from an additional problem.  The Court cannot readily determine the particular victims, the precise calculation of damages, or even the specific conduct which is alleged to have caused the damages, without conducting either an evidentiary hearing or continued supplemental briefing.  Neither Congress nor the Third Circuit Court of Appeals expect trial courts to go to such great lengths to frame a restitution order:

> This section shall not apply in the case of an offense described in paragraph (1)(A)(ii) if the court finds, from facts on the record, that--
> (A) the number of identifiable victims is so large as to make restitution impracticable; or
> (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

18 U.S.C. § 3663A(c)(3)

> The legislative history of the VWPA . . . does reflect what Congress contemplated would be involved in making restitution awards and we find this helpful.  Nothing in the legislative history evidences an expectation that a sentencing judge would adjudicate, in the course of the court's sentencing proceeding, all civil claims against a criminal defendant arising from conduct related to the offense.  Rather, it was expected that entitlement to restitution could be readily determined by the sentencing judge based upon the evidence he had heard during the trial of the criminal case or learned in the course of determining whether to accept a plea and what an appropriate sentence would be. . . .  The kind of case that Congress had in mind was one in which liability is clear from the information provided by the government and the defendant and all the sentencing court has to do is calculate damages.

<u>United States v. Kones</u>, 77 F.3d 66, 69 (3d Cir. 1996.)

This is not a case where "all the sentencing court has to do is calculate damages."  The Court does not have enough information to make a proper determination as to the cause or amount of the alleged victims' losses.  Because such a determination would require further adjudication of the issues and would prolong an already lengthy sentencing period,[2] the Court finds that need to provide restitution in this case is outweighed by the burden on the sentencing process.

These issues are better left to the civil securities fraud action pending in the Southern District of New York.  This Court simply does not have the factual record at its disposal to craft a restitution order without prolonging sentencing for an

---

[2] The sentencing date has already been postponed twice for a total of six months.

intolerable period of time.

## CONCLUSION

For the foregoing reasons, the Court **denies** the Government's motion seeking restitution.  An appropriate order follows.


Dated: April 28, 2005


    /s/ William G. Bassler
WILLIAM G. BASSLER, U.S.S.D.J.